Thank you, Your Honor. Nick DePalma for the appellant, The Happy Group, which we call Happy Egg. Your Honor, in a consumer deception case, to certify a class, the district court has to ask, is deception a question of law or fact common to the class? And then two, does it predominate? And here the district court correctly decided deception is not common to the class. Individualized issues predominate. And the reason the district court erred is because the district court did then not say, what is the core element? Essentially, Your Honor's decision in White v. Symetra. What's the core critical element? What's the core theory? And we're submitting in a deception case, because every one of the California and New York causes of action require consumer deception. That is the core element. And when the court found that individualized issues predominated on that element, the district court was required as a matter of law to deny the motion for classification. How much does this turn on expert Morris and his opinion on the egg standards and the consumer expectations about what people understand when they're buying eggs and see a particular statement on a package of eggs? I think it turns almost entirely on that, at least in the context of the record below, Your Honor. I think, you know, in false advertising cases, consumer deception cases, you typically have two types of possible statements. You have literally false statements where someone says something, it's healthy, but, oh, it turns out you have more than the FDA allowance of sugar for the day, so it's not healthy. That's a literally false statement. Then you have the more nuanced one, which is where all the action is in these cases. And that's where someone says it's impliedly false. Right? Here, the carton says free range, pasture raised on over eight acres. That's literally true. These are not caged hens. They're not locked in the hen house. They're on a farm or multiple farms nestled in the foothills of the Ozark Mountains with more than eight acres per farm. Every morning the door opens. More than eight acres per hen? Per farm. It's 21.8 square feet of space per hen. But it's more than eight acres per farm, and every morning, unless it's dangerous weather conditions or incredibly low temperatures, the doors open and the hens forage. And the plaintiff's theory here, and this is why Morris is so important, the plaintiff's theory is, well, yes, that's literally true. Fine. Right? Your free range, your pasture raised, but you don't comply with the nongovernmental organization standard of the American Humane Association. And what that would do if we get into the weeds is that would say, well, every couple months, you've got to rotate those eight acres to another eight acres. Okay? We don't do that. And the important thing for the literal falsity perspective is we don't say we do that. Hapy Egg just truthfully says free range. Yes. I do have a question. I just want to make sure I understand procedurally where we're at at the district court, because I looked at the district court scheduling order, and it's my understanding that the expert discovery closes 90 days after class certification. Was that the case? Yeah, I guess I would say yes and no. I think everything got stayed after the court's decision for purposes of this interlocutory appeal, so nothing has happened after that. So here's the second part of my question. So couldn't plaintiff remedy Dr. Morris' opinion or find another expert to address the merits of their contention? No, Judge Mendoza, and here's why. And I would talk about your decision in Sally. I'm probably not pronouncing that right. But in Sally, there was this concept of an evidentiary defect in looking at time records, and I think this Court said, well, you know, that's very formulaic, and this defect could be cured, right, so the class can be certified. But post-Sally, in this Court's decision in Grodzinski and other decisions, this Court is affirming the exclusion of experts at the class certification stage under Dawbert in Rule 702. And to answer Judge Bress' question, which dovetails with yes, yes. Hold on. Can you cite what case you're citing to indicate that that would be foreclosed, given the scheduling order that indicates it closes in 90 days after? I just want to make sure I understand your argument and your authority. No, yes. The case that I was citing was the Grodzinski case, 957F3, 979, 9th Circuit, 2020, where the Court affirmed the exclusion of an expert at class certification, holding that under Dawbert, the district court must ensure that all admitted expert testimony is both relevant and reliable. And I would say the plaintiffs brought the motion for class cert. That means that they have to prove that common questions predominate on, under White v. Symetra, the critical or core issue in the case. And if the plaintiffs can't prove that, and we're not talking about a formulaic issue with whether they can review time records, whether that's hearsay, we're talking about they can't prove the core element of deception. And there's no indication they can't. I guess the reason I was asking is that I saw that Little v. Neutromex in 2024, where we held that there, that contrary to Neutromex's contention, there is no requirement that the evidence relied upon by plaintiffs to support class certification be presented in an admissible form at the stage certification, at the class certification stage. And then they cited Sally at 909-1004. So I guess that's where I'm, I might have to look at Graczynski because I don't, is it, what year was that? Graczynski is 2020. Okay. There's also Olean v. Bumblebee Foods, 31F4651, pin site 665. That's Ninth Circuit 2022 on Bonk. And that says, in carrying the burden of proving facts necessary for certifying a class under Rule 23b-3, plaintiffs may use any admissible evidence. And I guess just to round this off, Judge Mendoza, in summary judgment under Rule 56, you submit an affidavit. That affiant, that declarant might not be able to lay the foundation for everything in that affidavit. But a district court can still say there's, I'm confident you can submit, the facts in there are admissible. What we have with Dr. Morris and why Dr. Morris is different is because Dr. Morris has nothing that would be admissible. What Dr. Morris actually said is, he's a former USDA official. He is currently the head of a pollock association, a whitefish association in Seattle. He went to a few grocery stores in Seattle years after the class period. He looked at some of the egg cartons. Then he Googled AHA and some other things on the Internet. And then he said, I think, this is the definition of Ipsy Dixit, I think consumers would think that the industry standard is AHA. And that's why, and the district court actually was quite fair to Dr. Morris, because one of the things he said when I deposed him was he said, look, let me stop you there. I'm not qualified as an expert in egg standards. And the district court said, no, we're not dealing with his qualifications. What the district court is saying is what he did isn't sufficient. And unlike Sally or cases that rely on Sally, it's not a technical defect that could be cured. He'd have to do something entirely different than what he did. And what the results of that are, we have no idea. And one useful foil here is they had a causation, I'm sorry, they had a damages expert as well, but that damages expert didn't actually do the analysis. They just said what they would do. And we challenged that. And the district court said, no, that's sufficient because I'm confident they could do that. But the district court said, when I look at Morris, he's not giving me anything. He's not giving me something that says he could do that, let alone that that would provide the connective tissue that someone needs for deception. And to answer, to go back to Judge Bress's question, when you have a consumer deception case and it's not literal falsity and you're in implied falsity, you have to provide connective tissue. You have to prove, and here the plaintiff's theory was, the industry standard is AHA, therefore the happy egg truthful statement, pasture raised in over 8 acres, is misleading because it implies to consumers it follows the industry standard, which is AHA. And then you say, well, what evidence do you have of that, that that's common, right? Why is this different than the Thurgood case by Judge Posner out of the Seventh Circuit, where they had one plaintiff say, hey, I think stainless steel in a washing machine means no rust ever. And Judge Posner's like, but does every member of the 500,000-strong class believe that? Does anyone believe that? And that's the same question we ask here. Does anyone believe that when they read happy eggs carton, that means it's compliant with the AHA standard? And no survey was submitted to show that. No industry expert was submitted to show that. And that's why after a pretty fulsome analysis of the record, the district court said common questions do not predominate. And under White v. Symmetra, the next step should have been, now that I've reached that decision on the core element of deception, I am now going to deny the motion for class cert. That's what ought to have happened, and that's why we filed this interlocutory appeal. And I could talk more about each of these, because here the named plaintiffs, Plaintiff Rousseff, he worked at Whole Foods. The Whole Foods standard for pasture-raised is lower than the happy egg standard. It just means access to green space. It doesn't mean they get eight-plus acres. We far exceed that. And I asked him, if you don't see a certification, do you think it's certified? And he said, no, I know what certifications are. Well, we don't claim to be certified pasture-raised by the AHA. So, again, this is a truthful claim that's not literally false. Plaintiff Gambino from New York. I actually showed him a video, an aerial footage of our farm, and I said, hey, if something from this farm is pasture-raised, do you feel, do you agree? Is that fair? And he's like, yeah, if it's from that farm, I have no problems. I'm not deceived. So you have the named plaintiffs not providing any common evidence of deception. And that's where you get into Morris. What do you do when the plaintiffs don't say it, right? You say, Morris, can you say there's an industry standard and that consumers believe the industry standard applies? Because this is not true, but even if most of the eggs in the market were certified by AHA, they're not. That doesn't mean that someone who buys an egg that's not certified by AHA thinks it is certified. That's the connective tissue that was wholly missing from the plaintiff's deception theory. And that's why the court got that part right. The problem is the court did not then do the white v. Symmetra analysis and say, what is the critical element, what is the core theory, knowing that deception is the critical element and the core theory? Can I find that common questions of law, in fact, predominate over individual ones? And the answer was no, but the district court did not do that analysis. So what we're asking is that this court reverse and enter an order denying the motion for class cert. And may I reserve the rest of my time? Yes. Thank you. Good morning, Your Honors, and may it please the Court. Aubrey Wand, appearing for plaintiff's appellees. Just to start with the factual question to Judge Mendoza's question, expert discovery was not closed. So we fully had the opportunity to clear up any issues with Dr. Morris' testimony, if need be. Again, we disagree with the proposition that Dr. Morris needed to conduct a survey in this case, and I'm happy to explain why. But if that was necessary, expert discovery wasn't closed, and there was time for him to do that work. Well, I guess it depends. I mean, it's one thing to kind of make little adjustments to an expert report, but, I mean, the class motion was filed. There was evidence attached to it. So, I mean, we usually expect that to be kind of ready to go with the motion, and if there's some cleanup later, that's one thing. But we're talking about, based on the district court's decision, some pretty substantial changes to what Morris has done, it would appear. Well, let me try to answer that, Aaron, again. We do not believe that Dr. Morris needed to do any survey evidence, right, because our method of proving deception was a two-pronged approach. Dr. Morris was proffered to offer the opinion on the existence of an industry standard. We had another expert, Dr. J. Michael Dennis, who was our consumer perception expert, who did conduct a survey showing that the reasonable consumer believed that these eggs were pasture-raised eggs. So, fundamentally, the existence of an industry standard does not depend on consumer perception or survey evidence. But Dr. Morris, the district court still struck his testimony on that basis. Again, our position that that was an error of law. But Dr. Morris did, it's not like Dr. Morris didn't do anything in that regard, Your Honor. Dr. Morris did conduct what he called an informal survey, which was really just a snapshot of the market. He did online research. He went to stores. He considered other evidence in the record from Happy Egg and the industry that followed these hen welfare standards, but he looked at what was going on in the stores, and all of that corroborated what he already understood to be the case, which is every retailer, every major, except Whole Foods, and the rest of the industry essentially follows the standard. So he did do a survey, and to the extent that district court believed that survey did not comport with scientific standards, in other words, we acknowledge that it was never intended to be a formal survey, just to be clear. But, you know, it did not cover the states of California and New York. It wasn't statistically significant. But Dr. Morris did do an informal survey, and he could have, there was time for him to conduct that survey if he needed to do that. But I think it's also worth pointing out, Your Honor, to that point, is that the results of that survey wouldn't really have made a difference. The record evidence is uncontested that every major retailer, other than Whole Foods, followed these standards. Happy Egg's own industry standards expert testified that it wouldn't matter if 100% of the retailers followed the hen welfare standards. It would be the position that the UEP takes, right? So the bottom line is that it wouldn't have mattered if Dr. Morris's survey proved 100% of the retailers followed the standard, even according to Happy Egg. But, again, if the district court still believed that that was necessary, there was time for Dr. Morris to do that. And, Your Honor, you asked my colleague at the beginning, what is the, to what extent does this case, the predominance issue, turn on the sufficiency of Dr. Morris's testimony? And I asked my colleague to say that it fully turns on that issue. And we agree with that, Your Honor. The district court's predominance finding was predicated entirely on striking Dr. Morris's expert testimony. Therefore, this court has jurisdiction over that. And if it reverses the Daubert ruling, then it would resolve the Rule 23b3 issue as well. Again, Dr. Morris's primary opinion was that the hen welfare standards for pasture-raised eggs, and those are the standards set by the AHA and the HVAC, are the industry standard. This is not controversial. Experts routinely opine on the meanings of industry terms across industries. And I think that's— What is the common proof, though, that any consumer would understand this to be the case? Well, Your Honor, again, our method of proof was twofold. First, establishing the existence of industry standard. And that was the purpose of Dr. Morris's testimony. And, second, the proof was from Dr. Dennis. He conducted a survey, which the defendants didn't challenge. And he's an expert in conducting consumer perception surveys. The results of that survey showed that the vast majority of consumers believe that these eggs are pasture-raised eggs. So, therefore, the reasonable— Did the survey shed any light on this key issue of the industry standard and whether consumers understand that to be a reference to some kind of industry standard? No, it didn't, Your Honor. We don't believe that was necessary because of Dr. Morris's component, which is first establishing the existence of an industry standard. So I don't think it's—I don't think the reasonable consumer, Your Honor, is expected to know, all right, well, these pasture-raised eggs are certified by the AHA or the HVAC. I mean, there's examples of, you know, there could be a standard of identity for a food product set by the government. I don't think the reasonable consumer is expected to know the details of that. Well, I guess I don't—I'm not understanding your point you just made because if you're saying that Dr. Morris is supposed to present the industry standard, Dr. Morris's testimony is excluded. Right. Well, our absolute—our main argument, Your Honor, is that Dr. Morris's expert testimony should not have been excluded, and the district court committed an abuse of discretion by excluding his testimony based solely on the fact that he did not conduct a survey and that that survey did not comport with scientific standards governing survey research. Well, this was kind of why I asked your friend on the other side how much of this is really riding on Dr. Morris. And if I were to think—let's just say hypothetically, I would just think that the district court did not abuse its discretion in striking Dr. Morris, how then do you—how then do you prevail here? Yes, Your Honor, I think two points on that, Your Honor. First, we did submit other evidence in support of an industry standard in addition to Dr. Morris's testimony. So Happy Egg itself and the rest of the industry considered the hen welfare standards to be the industry standard. So we submit that that is common evidence from which a jury could conclude that those are the industry standard. We also submitted evidence from the UEP that took the position that the hen welfare standards are the industry standard, and Happy Egg's own industry standards expert testified that the position taken by the UEP would represent the position—would represent the industry standard. So even putting aside the admissibility of Dr. Morris's opinion, we think those two other categories of common evidence could be used to prove the existence of an industry standard. Let me ask you, you said that Dennis' testimony was that people understood pasture-raised to mean pasture-raised? That is, what exactly did he connect what his consumers meant? Because I thought Happy Egg agrees that people think pasture-raised means pasture-raised. Well, so the cartons, Your Honor, the challenge statement that's printed on the cartons is free-range, pasture-raised on over 8 acres. So I think from our perspective, what we needed to prove was, do consumers believe, based on that challenge claim, that these eggs are pasture-raised? And so I find it a little— Just to put a pause there, but doesn't it depend on what we mean by that? Because it may be factually untrue. The hens may be raised in a dark tunnel, so that's not pasture-raised. But they may be raised on something that looks a lot like a pasture, and then we're asking ourselves, is that really what we mean by pasture-raised, or does it mean something more technical in this industry? I took your position to be the latter. Well, Your Honor— But the Dennis doesn't go to that point. Morris does. Morris goes to the point of the existence of the industry standard. And I do believe if you find, whether through Dr. Morris' testimony or the other independent evidence that I was just talking about, that there is an industry standard, then it's not incumbent on Dennis to conduct a survey— No, I was just trying to get to the point, though, of what does Dennis actually prove? Because I thought Happy Eggs would agree that the statement on their cartons does mean that it's pasture-raised. Well, I don't think—I wish that was the case. I don't think Happy Egg is conceding that consumers believe these eggs are pasture-raised. I think they absolutely are arguing that consumers think they're free-range eggs. That's why Happy Egg put both statements on the carton. So it's not—they call it a reading test, but Dr. Dennis didn't do a reading test. He asked—there is the free-range claim and the pasture-raised statement on the cartons. And so I don't think it's obvious that a consumer necessarily believes that these eggs are pasture-raised. That's where Dr. Dennis' survey came in to prove that. I mean, I think, again, just to be clear, I think maybe it's helpful to look at this Court's decision in the Desera v. Dr. Pepper case, where there was this tension between a consumer survey testing how consumers understand the meaning of diet with respect to a diet soda. And this Court held that, well, that's not—that doesn't just carry the day. That consumer understanding is inconsistent with how an industry defines the term. So I think you have this situation where there is an industry standard that we need to prove, and that's what we tried to do through Dr. Morris and this other evidence. And once we've established that, then I don't think it's a matter of proving that consumers believe it's pasture-raised under the industry standard, if that—I hope that made sense. So, counsel, if you—if we disagree with you that Dr. Morris—that it was incorrect— in other words, if we affirm the judge excluding Dr. Morris, then you agree that you would lose? No, I'm sorry, Your Honor, if I—we don't agree with that. We think that is the most efficient and straightforward way to resolve this appeal. But I think we could still win if you found that the other common evidence that we submitted could be used to prove the existence of an industry standard. The way the district court did this was a little bit different, because the district court basically said, well, there's not common evidence of deception, but there is common evidence of materiality and damages. Do you think you can win on that theory, that we just put common deception off to the side totally, and can you—can this be sustained based on the latter two pieces of this? Your Honor, let me try to explain. I think there's a little bit of nuance to that argument. I think from our perspective, the district court had discretion to certify that class, even assuming that the deception was not a common question that predominated. So we think the district court had the discretion under Rule 23 to do that. However, and I think that's primarily because classification rulings are tentative and they're procedural. So after the district court issued that ruling, there would as a matter of proof, a lot could have developed. We could have submitted Dr. Morris's opinion in admissible form. We have this other common evidence that I just discussed that we would have submitted at summary judgment and would try to admit at trial. I guess I'm having trouble with the, you know, we would submit Dr. Morris's opinion in admissible form because it would mean basically completely redoing what he did. That the district court was not—by the district court's lights, I mean, the district court was not satisfied with the methods that he undertook. And so whether he could undertake some different methods or not, I don't think that's just like a kind of minor tweak to what he's doing. It's a complete overhaul of his work. And whether the district court would have permitted that, I don't know. Well, I don't know that either, Your Honor. I mean, I just try to push back on that a little bit. I mean, I think that the district court misunderstood the purpose of Dr. Morris's testimony, which was to establish the existence of an industry standard, which does not depend on consumer perception. And I'll refer back to the Dr. Pepper case. And it believed that Dr. Morris should have conducted a survey based on some testimony where he said, I've done consumer perception surveys in his current role at Alaska Pollock. But he was fundamentally trying to test something entirely different in that case. So I think the district court made a mistake there. But the point I was trying to make, Your Honor, is simply that if— again, we don't think a survey was needed at all. But if one was needed, Dr. Morris did start that process. He didn't need to do it. It's sort of the cherry on top. He had already established what he needed to from a factual basis to form his opinion. But he could do a survey. I guess I went back and I was looking at the district court order. And at ER 8, the court actually said, the court rejects happy group's contention that Dr. Morris lacks the specific expertise needed to opine on egg standards. But what it did do, it went on to exclude his opinion based on consumer perception. So that's a fine distinction. I think that's the point that you're trying to make, correct? Yes, Your Honor. Thank you. I think that's exactly the point I'm trying to make. I think under Hangard or under Rule 702, I think Dr. Morris's qualifications are a primary component of assessing his reliability. But to your point, Dr. Morris was not put forward as a consumer perception expert. He was not put forward to offer an opinion on consumer perception. And I think I just — But what is the evidence on consumer perception, then? It's Dr. Dennis' testimony, Your Honor. But does he actually get into the issue that we're talking about, which is the consumer perception of what this phrasing means as it relates to an industry standard? No, he doesn't. But that's why — that's where first we established that Dr. — from Dr. Morris, the existence of an industry standard. So let me try to give — maybe this example may be helpful. There are grades for eggs. And that, like, grade AA, that's set by, I believe, the USDA AMS Department. If you were to ask a consumer, do you believe these are — let's say, hypothetically, that those eggs don't meet that standard. Well, I think the test from the reasonable consumer standard would be to ask consumers, do you believe these are AA eggs, grade AA eggs? It wouldn't be, do you believe these are USDA AMS-set grade AA eggs? So I think if we establish as a predicate that the hen welfare standards are the industry standard, then all we need to do is prove that consumers actually believe that these are pasture-raised eggs. So we don't believe that Dr. Dennis needed to stay in his survey, ask consumers, do you believe these are AHA, HVAC pasture-raised eggs? I think that's antithetical to the reasonable consumer standard. But again, expert discovery hadn't closed. And if it's not — if the district court believed that Dr. Dennis needed to conduct a different survey, he could have done that, too. And I think we did specifically ask the district court for the opportunity to do that if it had concerns. And I do think that's within the district court's discretion to allow that. Let me see if other colleagues have questions for you since we let you go a little over.  I want to thank you very much for your presentation, and we'll hear a brief rebuttal. Thank you, Your Honor. Thank you, Your Honor. So if I may pick up where I left off, one clarification on the expert discovery, and we pointed this out on page 7 of our reply brief. Fact discovery closed on April 11, 2023, and certification-related expert reports were also due April 11, 2023. So there was not more time to do new expert reports. Turning to Morris, and in connection with that record site, after the court said, look, the gentleman is qualified, the court then looked at reliability, and on page 8 of the court's opinion, the court specifically noted, he conducted online research, looked at grocery stores in or around his neighborhood, and took pictures of different egg products bearing a pasture-raised label. And then he said, this is not intended to be a comprehensive survey. And then he testified there was no methodology for taking pictures of cartons, no scientific basis for the days he chose to visit stores, and he only selected cartons if they said pasture-raised. And the court didn't even get into, this is in Seattle, it's not in California, it's not in New York, and he did it in real time. He made no effort to even see what was on the shelves during the class period, which was May 2019 to December 2021. And I asked him, was this supposed to be scientific? And he said, absolutely not. Absolutely not. And then what the court said was, look, what he's doing for his personal purposes does not satisfy Daubert. And the court went on that he actually failed to do what he would do as a professional. And that's why the court said, look, he is disqualifying himself. He's saying, I can commission surveys, but I chose not to do that here because this is just for my own personal purposes. Just because I'm a Pollack guy, I needed to get familiar with eggs. And that's the very definition of Ipsy Dixit. And there's no suggestion whatsoever that even given more time, he could provide that connective tissue. What about Dennis? So Dennis was my third point. Thank you, Judge Press. So Dennis, and I think that you were asking these questions, one can run a survey and say, here is the carton. What does that mean? And then one could do a control and remove the word pasture and say, what does this mean? And then you could ask targeted, close-ended questions. Does this data imply something about certification by the AHA? Does this data imply something about the industry standard? What do you think pasture raised means? What do you think free range means? One could ask those questions. Dennis did not ask those questions. Dennis just removed the word pasture raised and over 8 acres from the control, and then he said, select which ones are pasture raised. And tellingly, when consumers saw pasture raised, they said, it doesn't tell us anything about what consumers believe. So there was a conscious decision not to ask that. And I would say we cite in our brief, we had our own survey expert, to the extent that the Court's curious about it, who actually did ask those questions, and the answer was absolutely zero consumers believe that this is an industry standard or that our eggs were certified. Okay. Thank you very much. I want to thank both counsel for the very helpful briefing and argument. This case was well presented. This case is submitted.
judges: Boggs, BRESS, MENDOZA